UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| e360 INSIGHT, LLC, an Illinois Limited Liability Company, and DAVID LINHARDT, an individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 06 C 3958 |
| THE SPAMHAUS PROJECT, a company limited by guarantee and organized under the laws of England, a/k/a THE SPAMHAUS PROJECT, LTD., | ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case arises out of a dispute between e360 Insight LLC ("e360") and David Linhardt on one side and The Spamhaus Project Ltd. ("Spamhaus") on the other. e360 is an email marketing company founded by Linhardt; Spamhaus is a volunteer spam watchdog organization based in the United Kingdom. In March 2010, a bench trial was held on issues of appropriate damages to be awarded to Linhardt and e360 on their claims of tortious interference with contractual relations, tortious interference with prospective economic advantage, and defamation.

## BACKGROUND

e360 operated from March 2003 until January 2008.  It was formed by Linhardt as a company that would provide analytic processes and marketing services to customers, including email marketing.  The components of e360's operations consisted of computer equipment, Internet connectivity, customers, and an inventory of email addresses.  e360 did not own the vast majority of the lists of email addresses to which it sent marketing materials; instead, they were leased or licensed from third parties.

Until 2005, Linhardt was e360's only employee; he used contractors to assist him with e360 work until he began hiring employees in 2005.  e360 obtained customers through Linhardt's contacts made before e360 was formed, new contacts made at trade shows, and networking.  Most of the clientele came through the latter two avenues.

Linhardt initially owned e360.  Eventually, he formed another entity called Maverick Direct Marketing, of which he was the sole owner.  Maverick in turn owned e360 as well as nine other unique companies.  One of the Maverick-owned companies, called BargainDepot, bought and sold consumer goods such as hats, handbags, and sunglasses via its website, accessible via the URL www.bargaindepot.net.

Beginning in 2006, Spamhaus listed e360 and Linhardt as being involved in transmitting unsolicited email, colloquially referred to as "spam."  Internet service providers who accessed Spamhaus's lists used this information to block email messages

- 2 -

sent from domains associated with Linhardt or e360 before they ever appeared in a user's email inbox.  The resulting reduced capability of e360 and Linhardt to engage in email marketing led them to seek legal remedies against Spamhaus in this suit.  In the complaint, e360 and Linhardt allege tortious interference with contractual relations, tortious interference with prospective economic advantage, and defamation by Spamhaus.  Spamhaus initially answered the complaint, but at the first court appearance, it withdrew both its counsel and its answer despite being warned that its chosen course of action would result in entry of default.

Default judgment was entered on September 13, 2006.  In support of his request for damages, Linhardt filed an affidavit stating that because of Spamhaus's actions, he and e360 had lost active and pending contracts with three customers: SmartBargains, Vendare Media, and OptinBig.  Def. Ex. 3 ¶ 32.  According to the affidavit, the revenue lost as a result of the cancellation of the contracts with these three clients totaled $2,465,000.  *Id.*  Linhardt went on to state that he and e360 had also lost opportunities to obtain future work with prospective customers such as NetBlue, Cogent, Habeas, and Yipes.  *Id.* ¶ 33.  Linhardt placed the lost value to e360's business from these stymied relationships at $9,250,000.  Combining this figure to the aforementioned $2,465,000 produced a final claim for damages of $11,715,000, and that amount was awarded without challenge.

After collection procedures commenced, Spamhaus elected to rejoin the suit and filed an appeal and a motion to vacate the default judgment. The latter was denied shortly thereafter and the former proceeded before the Seventh Circuit, which rejected Spamhaus's challenges to personal jurisdiction and propriety of service and affirmed liability. *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007). With regard to damages, however, the Court of Appeals stated that "a more extensive inquiry [was required] into the damages to which e360 is entitled." *Id.* at 603.

The parties then engaged in discovery as to damages. Linhardt and e360 were slow to provide information requested by Spamhaus. Several deadlines were missed without explanation, and eventually a court order commanded disclosure by a date certain. The date came and went without compliance, and Spamhaus requested dismissal of the case as a sanction. A month later, when Linhardt and e360 supplied the requested information, they claimed that the proper amount of damages was in excess of $135 million, rather than the $11.7 million that had been stated earlier. Because of the extremely tardy provision of these new numbers, any amounts stated in the discovery responses in excess of $11.7 million were stricken.

Commencing on March 16, 2010, a bench trial was held as to the amount of damages to which Linhardt and e360 are entitled as a result of Spamhaus's conduct. On the eve of trial, Linhardt produced additional documentation, designated at Plaintiffs'

Exhibit 5(a), in support of a damage amount of $122,271,346.  By the time the evidence

phase of the trial was completed three days later, Plaintiffs shifted the number again,

this time to $30 million.  In view of e360's termination of operations in the interim,

injunctive relief was no longer a relevant consideration.

Taking into account all admissible evidence proffered at trial, we now consider

what amount of damages Plaintiffs are due.

## DISCUSSION

### I.  Motion to Strike Plaintiffs' Exhibit 5(a)

Plaintiffs' Exhibit 5(a) consisted of several spreadsheets of calculations that

formed the basis for many of the components of the requested damage of $122 million

plus asserted at the start of the trial.  The spreadsheets were not produced until well

after the discovery cutoff date, exceeded the amounts set out in the default judgment

affidavit, and differed from the amounts stricken as a discovery sanction.  Arguing that

these documents should be stricken as untimely and prejudicial, Spamhaus moved just

prior to trial to strike proffered Exhibit 5(a).  After the motion was taken under

advisement, the exhibit was extensively used and referred to during the course of the

trial by both sides.  Specifically, Linhardt testified and was cross-examined at length

about the contents of the exhibit and how he created it; Spamhaus's expert also

comprehensively commented on its contents.

The proffered Plaintiffs' Exhibit 5(a) is not received in evidence for both procedural and substantive reasons. Its submission at trial was well past deadlines set by the court in addition to exceeding the limit of damages set by the court as a sanction for the Plaintiffs' multiple breaches of their discovery obligations. The substantive reason precluding its consideration is the exhibit's failure to satisfy the fundamental requirements of admissibility under Federal Rule of Evidence 702. Linhardt is lacking in expertise necessary to establish the foundational basis for admissibility, and no scientific or other reliable principles or methods were used in the exhibit's preparation. Consequently, the motion to strike proffered Exhibit 5(a) is granted.

## II.  Findings of Fact and Conclusions of Law

In the sections that follow, we examine Linhardt's asserted bases for an award of damages individually, but some items of general application can be addressed at the outset. First, damages awarded to a party must be determined by a trier of fact with reasonable certainty. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 406-07 (Ill. 2006). An exact determination of damages is not required, but Illinois law requires that damages be actual, not speculative or remote. *Id*. at 407.

Second, an owner or manager of a business can testify to data and related matters about the business, but expert testimony is required for all matters beyond the scope of his or her business knowledge. *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395

F.3d 416, 420 (7th Cir. 2005).  In order for testimony from a putative expert to be admissible, Federal Rule of Evidence 702 requires that the witness be qualified by knowledge, skill, experience, training, or education.  The rule also mandates that testimony given be based upon sufficient facts or data and be the product of reliable principles and methods.  Finally, expert witnesses must apply the principles and methods reliably to the facts of the case before the court.  Fed. R. Evid. 702.

Applying these standards to the testimony Linhardt gave regarding valuation of his business as an entity or franchise (enterprise) or in determining lost profits, we conclude that he is not an expert in either of these areas.  Linhardt claimed no prior experience in business or company valuations.  Nor does he claim an expertise in damage calculations.  Indeed, he admitted that he was not an expert in these areas. Aside from his concessions, it is also the case that nothing by way of knowledge, skill, experience, training, or education permits him to offer opinions which could be received on any of the damage calculations he sponsored and testified about.

Although Plaintiffs hired an expert in lost profits and business valuations for analysis and testimony in this case, his testimony was limited to criticizing the defense expert and to validate certain methodology employed by Linhardt.  This witness was not asked what an appropriate amount of damages would be and did not proffer any exhibits or opinions of an affirmative nature on that topic.  He was apparently not

commissioned to undertake that task.  The probative value of his testimony was, therefore, quite limited.

The unreliability of Linhardt's approaches is unmistakably demonstrated by the profound differences in claimed damages proffered at various points during these proceedings.  Finally, it strains credulity that a company that made only a fraction of the profits Linhardt asks for over the course of its five-year lifespan would have garnered profits in the amounts Linhardt set out in his testimony or documentary evidence.  The profit and loss statement Linhardt provided for e360 sets out the company's overall profits as $332,000.  Pls. Ex. 71.  However, given his admission that the statement represented a consolidation of the revenue from all of the companies held by Maverick, the number attributable to e360 would have been even smaller.  Linhardt testified that BargainDepot was not a separate entity from e360 and therefore all revenues recorded as being gained by BargainDepot were in fact those of e360.  However, his description of the activities of the two companies demonstrates that their businesses were very different.    Moreover,  the  documents  included  in  Plaintiffs'  Exhibit  5  show BargainDepot listed as a customer of e360, indicating that the two are in fact separate entities.  Based on this countervailing evidence, we conclude that Linhardt's testimony that BargainDepot was never separate from e360 is not credible, and the true amount of e360's profit over its five years would be less than $332,000.

To reiterate, there are substantial differences in Plaintiffs' damage requests. The variety and disparity in the amounts suggested seem to be dictated by time and place. At the time of the default judgment, the damages claimed were $11,715,000. During discovery, Exhibit 5 was proffered reflecting damages of $135,173,577. At trial, proffered Exhibit 5(a) showed damages of $122,271,346. During final argument, the claimed amount was $30,000,000. None of these figures was the product of expert testimony or use of a scientific or reliable methodology, nor based on relevant or supportable factual premises. As a result, none of the above amounts can be relied on or be a reasonable basis upon which to base a damage award.

Linhardt's evidence suffers from systemic problems, but individual deficiencies are also present and are itemized below.

*A. Interference with Prospective Economic Advantage*

1.  Lost Profits

e360's primary activity consisted of emailing advertisements or product offers on behalf of its customers; in total, it sent over 6.6 billion of these email messages. Customers paid e360 on either a per-click or a conversion basis. Either scenario began with an email message being sent from e360's servers. If transmission was successful, the message was received in the recipient's email inbox. If the recipient opened the email message and clicked on a link embedded within the message, he or she would be

- 9 -

connected to the customer's website.  In a per-click setting, only these steps needed to be completed for payment to be due to e360.  In a conversion payment arrangement, e360 would be paid only for transactions where the message recipient went on to purchase a product from or submit an online form to the customer via the website.  Tr. at 62, ll. 6-13.  According to Linhardt's testimony, in the early days of e360's business, the per-click model prevailed, but as time went on, the conversion method predominated.  Tr. at 80, ll. 19-23.  He did not elaborate when this change occurred or to what extent the different methods were used when both were an option.

Linhardt's first method of ascertaining damages for lost revenue consisted of what he described as a "very simple" calculation: the revenue generated by a completed email transaction multiplied by the number of blocked messages.  Tr. at 99, ll. 19-22. Though that formula is indeed simple and straightforward, a closer examination of the numbers employed in arriving at the eventual damage figure Linhardt cites reveals that it is fundamentally unsound.

Both of the components in Linhardt's formula are deficient, for different reasons. The first component is the more problematic of the two, in that several amounts factor heavily into the calculation without any explanation as to where the numbers originate. For example, Linhardt did not illuminate how he determined the figures he used for the average payout (i.e., revenue) per click for each year.  Moreover, other evidence that

is provided casts serious doubt on the accuracy of the dollar amounts Linhardt states he reached.  For example, the e360 profit and loss statement set out in Plaintiffs' Exhibit 71 states that the total revenue for e360 and BargainDepot combined in 2004 came to $415,072 for that year.  Even if all of that revenue had been derived from e360's email marketing business (which cannot be the case since BargainDepot sold goods costing $86,657 in that same year), the revenue per 1000 messages sent would be $5.09,[1] not the $29.85 given in Linhardt's calculations.  Applying the same calculation to other full years of data provided by Linhardt shows a reduction from $10.47 to $2.86 in 2005, from $8.44 to $1.25 in 2006, and from $6.73 to $0.21 in 2007.  Such drastically different numbers puts the damage amounts requested by Plaintiffs solidly into the realm of speculative at best.

Furthermore, the process Linhardt used to determine the average unblocked click-through rate was arbitrary.  By his own description, he chose ten email marketing campaigns e360 conducted, which represented less than one tenth of one percent of the total number of messages e360 sent over its five years of operations.  Five of the

---

[1]$415,072 (total revenue for 2004) / (398,974,621 [total number of messages sent in 2004] - 317,454,458 [number of messages sent to domains listed as Spamhaus users in 2004]) * 1000 = $5.09.  Given that the total revenue listed in Plaintiffs' Exhibit 71 included BargainDepot revenue and that not all messages sent to domains listed as Spamhaus users were blocked for reasons described later in this opinion, the actual amount of revenue per 1000 messages is more likely than not even less than the $5.09 shown by these numbers.

campaigns he described as "good" and five as "bad," without providing any elaboration on what criteria he employed to place the campaigns into those categories. The campaigns were inexplicably temporally clustered, rather than being drawn from across the five-year span of e360's operations: three took place within the span of ten days in March 2006, two within four days of each other in June 2006, two within two weeks of each other in March 2007, two within four days of each other in July 2007, and one in October of 2007. In fact, the only universal characteristic Linhardt pointed out among the ten campaigns was that they all occurred when Spamhaus blocks were in place. This selection did not result in a sample that was statistically significant or otherwise able to provide representative information about e360's business as a whole. Despite that, Linhardt used information from these campaigns to arrive at a single number - 4.79% - that he insists was the average click-through rate for all unblocked messages e360 sent. The 4.79 figure is the average of all the average unblocked click rates for the ten campaigns, but there is no indication in the testimonial or documentary evidence as to how the average unblocked click rate was derived for the individual campaigns.[2]

---

[2]For instance, with regard to the campaign run on July 11, 2007, 695 out of the 55,141 messages sent resulted in a click, or 1.26% of the whole. However, the average unblocked click rate Linhardt uses for this campaign is 11.25% (129/1147). He offers no rationale for the second percentage or the numbers used to arrive at it.

Linhardt's model also did not take into account differences in revenue obtained in the per-click compensation system as opposed to the conversion payment method. It appears, from his description of the different pricing models, that per-click transactions would generate payment for e360 with less action taken by the recipient than that described for a conversion transaction. However, he did not calculate the level of revenue e360 obtained from each of the two payment systems. Instead, he included both rates in calculating average revenue for periods of time during which both pricing models were used, with no weighting or adjustment to reflect the incidence of use of the different models. This practice skews the resulting products in favor of the per-click method during the latter period of e360's business despite Linhardt's countervailing testimony that the conversion method, which would generate less revenue per message sent, was the predominant pricing model in the business for most of e360's lifetime.

With regard to the second component of the formula, the number of blocked messages, Linhardt concluded that approximately 3 billion of e360's 6.6 billion plus sent messages were blocked by service providers who were relying upon Spamhaus's representations that e360 was a spammer. In arriving at this number, Linhardt assumed that, over the course of a year, if e360 received an error message that referred to Spamhaus once from a particular domain (e.g., yahoo.com, comcast.net), all messages sent to any email address within that domain for the entire year would be blocked.

- 13 -

However, Plaintiffs' evidence demonstrates that assumption is fallacious.  In 2006, 19 of the 100 domains that Linhardt lists as having been confirmed as Spamhaus users were shown as having email account holders who not only received but acted upon messages sent by e360 in either March or June of that year as part of the ten purportedly representative campaigns Linhardt identified.  As Linhardt put it, the data from these campaigns "illustrate[] quite clearly examples where [e360 was] successfully able to get the messages through."  Tr. at 77, ll. 8-12.  These domains represent 42,247,018 of the 71,427,154 email accounts e360 states comprised its active records in 2006.  In 2007, the corresponding numbers are 11 of the 100 domains and 25,373,784 of the 64,858,956 active records.  In other words, more than half of the records upon which e360 bases its damages claims for 2006 and nearly half of those for 2007 were not blocking e360's messages throughout the year.  Consequently, the figure used for the second portion of all of Linhardt's lost revenue calculations is fundamentally unsound.

Last but certainly not least, rather than seeking to calculate lost profits, Linhardt focused only on revenue, failing to factor in costs or expenses that would need to be deducted to determine profits.  *See*, *e.g.*, Tr. at 87, ll. 2-11.  Neither did he rule out or even attempt to quantify the effect of causes other than Spamhaus's actions.  Illinois law requires plaintiffs claiming lost profits to engage in that effort "since lost profits are frequently the result of several intersecting causes."  *Midland Hotel Corp. v. Reuben H.*

*Donnelley Corp.*, 515 N.E.2d 61, 66 (Ill. 1987).  Thus, we conclude that Linhardt's

evidence as to lost profits is speculative and not capable of supporting the damage

amounts he requests.

## 2.  Lost Enterprise Value

Linhardt's second method of quantifying the effect of Spamhaus's actions on

e360's business prospects was to attempt to calculate e360's enterprise value.  At the

time the default judgment was entered, e360 was still operating.  Linhardt's affidavit

gave a figure for lost enterprise value of $9.25 million.  He arrived at this number

through a three-step process.  First, he calculated the value of the company at that time

as $2,000,000, which represented the approximate annual revenue of e360 doubled.

Second, he calculated what he felt the company should have been worth based on

e360's inventory of email addresses.  He stated that each active unique opt-in email

address was worth at least a quarter.  Multiplying the 45 million email addresses in

e360's databases by $0.25 resulted in a figure of $11,250,000.  For the last step of the

calculation, Linhardt subtracted the $2,000,000 that he thought the company was worth

from the $11,250,000, yielding the final number of $9,250,000.

Linhardt did not, aside from the affidavit submitted in support of default

judgment, advance the value of the email address inventory as a method of assessing the

value of e360's business.  The evidence elicited at trial demonstrated that the value per

address Linhardt employed in his affidavit was derived from an inapt analogy.  It came

from an initial asking price for addresses in an email database owned outright by a

company called Fingerhut.  There is no evidence that anyone bought the database, so

the figure is merely what Fingerhut hoped someone would pay, not the actual value of

the addresses.  Moreover, as was pointed out on numerous occasions during the trial,

in the vast majority of cases, the lists containing the email addresses to which e360 sent

advertising messages were used pursuant to a lease or license from a third-party owner.

It is an elementary legal principle that a right gained through lease or license is not of

equivalent value to an ownership right, so Linhardt's direct importation of a number

used by an owner of a list of email addresses would not produce a reliable figure even

if Fingerhut had been able to find a buyer at the $0.25 per email address price.  Thus,

Linhardt's proffered enterprise value for e360 based upon the value of its email

inventory is not a reliable measurement of damages.

However, valuation of the email address inventory was not Linhardt's only

attempt to set a number on the value of the business.  He also attempted, despite his lack

of expertise in the area, to apply an earnings before interest, taxes, depreciation and

amortization ("EBITDA") analysis.  In addition to lacking the necessary expertise to

employ this method, Linhardt's testimony demonstrated that his methods were flawed.

He attempted to apply a "comparable company" analysis, but the limited evidence about

the four companies Linhardt selected as comparable to e360 reveals that they were not, in fact, comparable to e360. Tr. at 109, ll. 15-25; 110, ll. 1-6. Specifically, Linhardt stated that all four companies were much larger than e360 in terms of number of employees and level of revenue. All four were publicly traded, unlike e360. Two of the companies had diversified operations beyond email marketing efforts. Finally, at least one of the companies derived the majority of its revenue in European markets. In short, there is nothing about these companies that would lead to an inference that the EBITDA multiples pertaining to their businesses would shed light on the value of e360, let alone that an average of the four multiples would be directly applicable to a determination of e360's overall worth.

Finally, Linhardt's affidavit and proffered damage amount also included amounts of potential revenue resulting from an unrealized business relationship with a company called NetBlue. According to Linhardt's testimony, he calculated these amounts by extracting the operating history from a different company called Silver Carrot and using it as though it were that of NetBlue. Because Linhardt perceived the two companies to be direct competitors who had similar modes of operation, he simply used Silver Carrot as a surrogate for NetBlue, without any adjustments for differences between the two companies. There is no evidence to support the reliability of this approach, and it fails to provide a reasonable basis for an award of a specific amount of damages for the loss of potential economic advantage with NetBlue.

- 17 -

In sum, despite the fact that Spamhaus has been found liable to e360 for tortious interference with prospective economic advantage, the evidence provided does not permit a reasonable calculation of damages on this cause of action.  In circumstances such as this, Illinois law permits no more than an award of nominal damages.  *Peoria & Pekin Union Ry. Co. v. Peoria & Farmington Ry. Co.*, 105 Ill. 110 (1882); *In re Marriage of Ferkel*, 632 N.E.2d at 1138.  Consequently, Plaintiffs are awarded damages in the amount of $1 on their claims of tortious interference with prospective economic advantage.

## B.  Interference with Existing Contracts

Turning to the second cause of action set out in the complaint, intentional interference with existing contracts, Linhardt's testimony provides some reliable information gained through his actual experience with e360's business.  In 2004-2006, e360 regularly provided services to three companies: SmartBargains, Vendare Media, and Optinbig.  Tr. at 102, ll. 7-13.  During the time that SmartBargains was a customer of e360, it paid approximately $6,000 a month for the services e360 performed.  Tr. at 102, ll. 15-16.  During the time that Vendare Media was a customer of e360, it paid approximately $15,000 a month for the services e360 performed.  Tr. at 102, l. 16.  During the time that Optinbig was a customer of e360, it paid about $6,000 a month for

the services e360 performed.  Tr. at 102, ll. 16-17.  As a result of Spamhaus's actions, e360 lost its contracts with these customers.

Despite the reliability of Linhardt's testimony as to e360's actual experience with these customers, he injected unreliability in the form of the 48-month multiplier he applied to the monthly average payments to generate his requested damage amount. That figure was not predicated on any scientific principle and is greater than experience reflected, as Linhardt's own testimony indicated that long-term agreements with customers were not the norm in the industry.  Tr. at 127, ll. 8-9.  In light of that testimony, we do not find it more likely than not that all three of these contracts would be exceptions to this general rule.  Accordingly, we reject the application of the 48-month multiplier.  However, based on the unrefuted testimony that the relationships with these three customers were not in danger of ending prior to Spamhaus's actions, we find it more likely than not that they would have continued to do business with e360 for one additional month beyond the end of the relationships precipitated by Spamhaus. Accordingly, Plaintiffs are awarded damages for this claim of $27,000, equivalent to the amount of the payments e360 would have received for one additional month's worth of work for each of these customers.

## C. Defamation

That leaves only the last cause of action for which Spamhaus has been found liable: defamation.  Linhardt's testimony on the extent of the damage he and e360

experienced in this regard was speculative and conclusory and did not have any

probative value that would permit assessment of a sum certain.  Tr. at 107, ll. 23-25;

108, ll. 1-25; 109, ll. 1-9.  As a result, Plaintiffs are awarded damages in the amount of

$1 on their claims of defamation.

### CONCLUSION

Based on the foregoing analysis, e360 and David Linhardt are awarded $27,002

in damages on their claims of tortious interference with prospective economic

advantage, tortious interference with contractual relations, and defamation.   No

injunctive relief is awarded on any claim.

It is so ordered.


_____
Charles P. Kocoras
United States District Judge


Dated:  ___June 11, 2010_____